ALEXANDER PENNY, plaintiff in error, *v.* JAMES LITTLE *et al.*, defendants in error.

*Error to Schuyler.*

The provision in the ordinance of July 13, 1787, ceding the north-western territory to the United States, that the inhabitants of said territory shall always be entitled to the benefit of judicial proceedings, according to the course of the common law, intends the common law, as it was then understood and expounded, by the courts in America.

A landlord has a right to distrain for rent, where no power of distress is contained in the lease.

W. A. MINSHALL, for the plaintiff in error, relied upon the following authorities:

R. L. 676, § 6; Stephen on Plead. 377, 430; 3 Black. Com. 6, note 8; Kent's Com. 460–1, 483, note *a;* 2 Black. Com. 42–3; 3 Kent's Com. 470; Bradby on Distress, 30, 99, 100; 3 Kent's Com. 484; 3 Cruise's Dig. 308, § 8; Burn's Justice 425; Woodfall's Landlord and Tenant, 152.

C. WALKER and J. B. THOMAS, for the defendants in error.

THIS cause was heard in the Court below, at the April term, 1841, before the Hon. Stephen A. Douglass.

DOUGLASS, Justice, delivered the opinion of the Court:

The plaintiff, Penny, sued the defendants, in an action of *trespass*, at the November term, 1838, of the Circuit Court of Schuyler county.   The defendants pleaded the general issue, which was joined, and also three special pleas, justifying the supposed trespass, under a landlord's warrant for rent.   The plaintiff demurred to the special pleas, and the demurrer being joined, was overruled by the Court, and, the plaintiff failing to answer further, judgment was rendered against him for costs, at the April term, 1841.

The errors assigned are,

*First.*  The Court erred in deciding the law to be against the plaintiff below, on the demurrer to defendants' pleas in bar;

*Second.*  The judgment of the Schuyler Circuit Court, was rendered for the defendants, when, by the laws of the land, it should have been for the plaintiff.

The case has been submitted without argument, and it is understood that the only question presented for the decision of this Court, is whether the right of the landlord, to distrain for rent, exists under the laws of the State, when the deed or lease does not expressly reserve this privilege.   It is to be regretted that so important a question should have been submitted without argument; a question which involves the legality of a supposed right daily exercised by a large portion of our community.   Our statute (1) provides that, " When any goods or chattels shall be distrained for rent, and the tenant or owner of the goods so distrained, shall not, within five days after such distress taken, and notice thereof, and the cause of taking, replevy the same, with sufficient security according to law, the person distraining, or his agent duly authorized, may, with the sheriff or constable of the county, cause the goods and chattels so distrained, to be appraised by two reputable freeholders, under oath ; which oath may be administered by such sheriff or constable, to appraise such goods and chattels, according to their best judgment and understanding ; the person making such distress, on giving ten days' notice, may sell such goods and chattels at public auction, and after retaining the amount of rent distrained for, and the costs of distress and sale, shall pay the overplus, if any there be, to such tenant or tenants."

It is apparent that this statute does not confer the right upon landlords to distrain for rent; but recognises the existence of such right, at the time, and prior to the passage of the act, and regulates its future exercise.   The existence of the right of distress being recognised and established, it becomes necessary to enquire into the extent of the right, and the kinds of rent to which it pertains.   The laws in force in this State, are all to be traced to one of two sources, the acts of our legislature and the common law.   By an act of our legislature, approved February 4, 1819, it is provided, " That the common law of England, all statutes or acts of the British Parliament made in aid of the common law, prior to the

(1) R. L. 676; Gale's Stat. 435.

fourth year of the reign of King James I," with three exceptions therein named, "and which are of a general nature, and not local to that Kingdom, shall be the rule of decision, and shall be considered as of full force, until repealed by legislative authority."

By the common law of England, there were three several kinds of rent, to wit: first, rent service; secondly, rent charge; and thirdly, rent seck. (1)

Rent service was where the tenant held his land by fealty, or other corporeal service, and a certain rent; and it was called rent service because it was given as a compensation for military, or other services, to which the land was originally liable. A right of distress was inseparably incident to this rent. Rent charge is where the rent is created by deed, and the fee granted; and as there is no fealty annexed to such a grant of rent, the right of distress is not an incident, and it requires an express power of distress to be annexed to the grant, which gives it the name of a rent charge, because the lands are, by the deed, charged by a distress. Rent seck, or barren rent, was rent reserved by deed, without any clause of distress, and in a case in which the owner of the rent had no future interest or reversion in the land. The owner of the rent was accordingly to pursue the slow and tedious remedy by a writ of annuity, or a writ of assize. (2)

Thus stood the common law prior to the fourth year of James I., and even as late as the fourth year of George II., when, by an act of Parliament, all distinctions between the several kinds of rent were abolished, so far as to give the same remedy by distress in cases of rent seck, rents of assize, and chief rents, as in case of rents reserved upon a lease. (3)

Prior to the passage of this statute, the right to distrain for rent in England, was restricted to rent service and rent charge. The question now arises, whether our statute in relation to landlords and tenants, taken in connection with the act adopting the common law of England, and the British statutes prior to the fourth year of James I., is to be understood as recognising the right of distress as it existed at that date, and excluding all the supposed benefits of the statute of fourth George II., extending the right of distress to all kinds of rent alike. If such is to be the construction of our statute, its provisions, in relation to distress for rent, will be rendered, nearly, if not wholly, inoperative.

The right to distrain for rent, as has already been shown, at the fourth James I., was confined to rent service and rent charge. In this country, we have no such description of rent as rent service. To constitute that kind of rent, it was necessary that the tenant should hold the land of his landlord by fealty or homage, as well as a certain rent. (4)

---

(1) 7 Bac. Abr. 3–8.    (2) 3 Kent. Com. 368.
(3) 3 Kent. Com. 368.    (4) Bradby on Distress 30–35–100; 7 Bac. Abr. 4.

From the nature and principles of our institutions, as well as our land system, the tenant cannot bear fealty or homage to his landlord, and consequently cannot hold by the tenure of rent service.

To constitute rent charge, it is necessary that the lease should contain a clause reserving the right to distrain for the rent. This is contrary to the universal practice of this country. Probably such a lease cannot be found in the State, yet scarcely a day passes that we do not see landlords distraining for rent. It is possible that landlords may have usurped, and daily exercised for twenty years, a summary, and by many supposed to be, an arbitrary and oppressive remedy, for the collection of rents; and that their tenants have quietly and tamely submitted to the usurpation, and that the bar have approved, and the Courts sustained the same, without conceiving that it was illegal; and such must inevitably be the case, if we are to be confined, in our decisions, strictly within the limits of the common law of England, and the British statutes in aid thereof, prior to the fourth year of James I., and our own statutes.

The common law is a beautiful system; containing the wisdom and experience of ages. Like the people it ruled and protected, it was simple and crude in its infancy, and became enlarged, improved, and polished, as the nation advanced in civilization, virtue, and intelligence. Adapting itself to the condition and circumstance of the people, and relying upon them for its administration, it necessarily improved as the condition of the people was elevated.

Is it to be presumed, then, that our legislature, in adopting the common law of England, and the British statutes in its aid, prior to the fourth of James, intended to exclude all the improvements in the common law since that period? I do not wish to be understood as saying that the act of the fourth George II., extending the right of distress to all kinds of rent indiscriminately, was an improvement; but I do say, that if we are to be restricted to the common law, as it was enacted at fourth James, rejecting all modifications and improvements which have since been made, by practice and statutes, except our own statutes, we will find that system entirely inapplicable to our present condition, for the simple reason that it is more than two hundred years behind the age.

Why, then, it may be asked, did our legislature fix the fourth James I., instead of the date of the declaration of independence, or of the formation of our Constitution, as the period for transplanting the common law of England into this country? The history of our own country furnishes the answer. That was the period at which the first territorial government was established in America, and with it the common law of England as it then existed. From that period we must look to American legislation, and the reports of American courts for improvements and modifications in

Penny *v.* Little *et al.*

the common law. In Virginia, the right to distrain for "any rent reserved and due upon a demise, lease, or contract whatsoever," was recognised by statute as early as May, 1730. (1)    The provisions of this statute, like our own, did not confer the right of distress; but recognised its existence, and regulated its exercise, in terms which clearly show that it was intended to apply indiscriminately to all kinds of rent certain.    The district of country north-west of the Ohio river, including the present State of Illinois, was then within the territorial limits of Virginia, and in 1778, was organized into the county of Illinois.    In 1783, it was ceded by the State of Virginia to the United States; and by the ordinance of the 13th of July, 1787, was erected into a territorial Government.    That ordinance contains certain articles of compact between the original States and the people in said territory, which articles, it is declared, shall forever remain unalterable, unless by common consent.    In said articles, it is provided, among other things, that the inhabitants of said territory, shall always be entitled to the benefits of judicial proceedings according to the course of the common law.    Did the parties to this compact intend to adopt the common law as it existed in England, before the settlement of America, or did they intend to adopt the common law as it then existed in this territory, modified, and improved, and adapted to the condition, circumstances, and habits of the people, by a long course of American legislation and American practice?    The mere statement of the proposition furnishes a sufficient answer.    It was evidently their intention to secure to the inhabitants of the territory, the benefits of the common law as it was then understood and expounded by the courts in America.

The inhabitants of this country always claimed the common law as their birth-right, and at an early period established it as the basis of their jurisprudence.    Slight changes and modifications were found necessary, and consequently adopted, by common consent, from time to time, to adapt it to our peculiar institutions, and the habits and customs of the people.    These changes, modifications, and customs having, for a long course of years, been acquiesced in by the people, and sanctioned by the courts, have acquired the force of law, and become incorporated into and made part of the common law of the land.    The legislation of the territory and of our State, was adopted with reference to the law as it thus existed in the country.    Upon this principle and none other, can we account for the numerous cases in which the common law has been changed by statute in England, since the fourth of James I., and those changes adopted by the courts in this country, without having been first re-enacted by our legislatures.    In confirmation of this principle, it is sufficient, for our present purposes, to cite the act of the territorial legislature, and the acts of 1819 and 1827,

(1) 4 Henning's Statutes 288.

recognising the right of distress in all cases, where the rent is cer-
tain, without reference to whether the lease contained a clause re-
serving the privilege of distraining for rent. We are therefore of the
opinion, that as the law now stands in this State, a landlord has a
right to distrain for rent, without reserving the privilege in the
lease.

The judgment is affirmed with costs.

*Judgment affirmed.*